## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LAWRENCE HOLLIN, derivatively on behalf of BIOGEN INC.**,** | ) ) ) | |
| Plaintiff, | ) ) ) | Case No.  24-12584 |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| MICHAEL R. MCDONNELL, CHRISTOPHER A. VIEHBACHER, MICHEL VOUNATSOS, ALEXANDER J. DENNER, CAROLINE D. DORSA, MARIA C. FREIRE, WILLIAM A. HAWKINS, WILLIAM D. JONES, JESUS B. MANTAS, RICHARD C. MULLIGAN, STELIOS PAPADOPOULOS, ERIC K. ROWINSKY, and STEPHEN A. SHERWIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| BIOGEN INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Biogen Inc. ("Biogen" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 14(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters,

based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Biogen, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Biogen against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between February 3, 2022 and February 13, 2024, inclusive (the "Relevant Period").

2.      Biogen is a multinational biotechnology company based in Cambridge, Massachusetts, that specializes in the discovery, development, and delivery of therapies for the treatment of neurological diseases to patients worldwide. The Company maintains a broad portfolio of medicines to treat patients suffering from, among other things, multiple sclerosis ("MS"), Alzheimer's disease ("AD"), spinal muscular atrophy ("SMA"), and Friedreich's Ataxia. The Company's AD-related treatments include Leqembi, anti-amyloid antibody, and, until January 2024, the intravenous infusion therapy Aduhelm.

3.      Biogen's sales of its MS-related products have historically accounted for the majority of the Company's product revenues. Steeper competition in the field of MS treatments has led to reduced revenue growth and declining sales for Biogen's MS-related products in recent

years. As a result, the Company has increasingly focused on developing its pipeline of new products in the neurology, specialized immunology and rare diseases sectors to bolster its revenues.

4.      In 2021, however, investigative reports emerged revealing that the Company had engaged in potentially improper communications with representatives of the U.S. Food and Drug Administration ("FDA") to win regulatory approval of Aduhelm for the treatment of AD, despite concerns regarding the drug's safety and efficacy, among other things. For instance, a July 19, 2021 article from the *New York Times* titled "How an Unproven Alzheimer's Drug Got Approved," reported that just two months before the FDA's deadline to decide whether to approve Aduhelm, a council of senior agency officials resoundingly agreed that there wasn't enough evidence it worked. The article further reported that allegations about collaboration between the FDA and Biogen prompted the FDA "to conduct an internal inquiry after a consumer advocacy group called for an inspector general's investigation[.]" The internal investigation had not been previously disclosed by the FDA.

5.      In February 2022, Biogen announced that the United States Federal Trade Commission ("FTC") and the SEC has asked the Company for information and documents relating to Aduhelm's marketing and approval.

6.      In December 2022, Oversight and Reform Committee Chairwoman Carolyn B. Maloney and Energy and Commerce Committee Chairman Frank Pallone, Jr. released a staff report titled "The High Price of Aduhelm's Approval:  An Investigation into FDA's Atypical Review Process and Biogen's Aggressive Launch Plans," (the "2022 Congressional Oversight Report") following an 18-month investigation into the FDA's regulatory review and approval process of Aduhelm, as well as Biogen's pricing strategies of the drug. The 2022 Congressional Oversight

Report found that, among other things, the FDA's interactions with Biogen were atypical and failed to follow the agency's own documentation protocol, the FDA and Biogen inappropriately collaborated on a joint briefing document for a key advisory committee, the FDA approved and Biogen accepted a broad label indication for Aduhelm, despite lack of clinical data on all Alzheimer's disease stages, and Biogen initially set an unjustifiably high price for Aduhelm, at $56,000 per year, despite the impact of the high price on patients and the Medicare program.

7.      The controversy surrounding Aduhelm's regulatory approval had, at least in part, led to the drug's failure to gain traction in the lucrative AD-treatment market. Accordingly, the Company pivoted its AD-focus on the launch of Leqembi, developed in partnership with Eisai Co., Ltd. ("Eisai"), which was approved by the FDA in 2023. Biogen and Eisai set a goal of having 10,000 patients on Leqembi by the end of March 2024.

8.      In February 2023, the Company released non-GAAP diluted earnings-per-share guidance in a range of $15.00 to $16.00 per share for full year 2023. Biogen reaffirmed this guidance over multiple quarters.

9.      In July 2023, Biogen announced that it would acquire Reata Pharmaceuticals, Inc. ("Reata") for $172.50 per share in cash, reflecting an enterprise value of approximately $7.3 billion (the "Reata Acquisition"). A July 28, 2023 press release announcing the Reata Acquisition stated that "Reata's FDA-approved SKYCLARYS® (omaveloxolone) is the first and only approved treatment for Friedreich's ataxia (FA) in the United States, with a commercial launch underway, and European regulatory review ongoing." In the same press release, Defendant Christopher Viehbacher ("Viehbacher"), Biogen's President and Chief Executive Officer ("CEO"), stated that the acquisition was a "unique opportunity for Biogen to bolster our near-term growth trajectory, and SKYCLARYS is an excellent complement to our global portfolio of treatments for

neuromuscular and rare disease." The press release also represented that the Reata Acquisition would only be "slightly" dilutive to Biogen's non-GAAP diluted EPS in 2023.

10.     On November 8, 2023, the truth began to emerge when the Company released third quarter 2023 results, negatively revising non-GAAP diluted EPS guidance for full year 2023 to $14.50 to $15.00 per share, down from the prior guidance of $15.00 to $16.00 per share.

11.     On this news, the Company's stock price dropped $13.92 per share, or 5.67%, to close at $231.69 per share on November 8, 2023.

12.     On January 8, 2024, Defendant Viehbacher attended the J.P. Morgan 42nd Annual Healthcare Conference (the "J.P. Morgan Conference") on behalf of the Company. In discussing challenges with the launch of Leqembi, Defendant Viehbacher tempered the previous expectations of treating 10,000 patients with Leqembi by the end of March 2024.

13.     On January 31, 2024, Biogen announced that it was discontinuing development and commercialization of Aduhelm and "has recorded a one-time charge of approximately $60 million related to close out costs for the program in the fourth quarter of 2023."

14.     On February 6, 2024, news reports emerged that Eisai was facing challenges with the launch of Leqembi and that only 2,000 patients in the U.S. had been administered the drug.

15.     On February 13, 2024, Biogen issued a press release announcing its fourth quarter and full year 2023 results, including fourth quarter non-GAAP EPS of $2.95, missing consensus estimates by $0.23, and fourth quarter revenue of $2.4 billion, missing consensus estimates by $60 million and representing a 5.5% year-over-year decline. The press release also revealed the negative effects of previously announced closeout sales for Aduhelm stating that Q4 "GAAP and Non-GAAP diluted EPS [was] negatively impacted by $0.35 related to [the] previously disclosed closeout costs for ADUHELM[.]"

16.     Also on February 13, 2024, the Company hosted a conference call with analysts and investors to discuss fourth quarter 2023 and full year 2023 results. During the call, Defendant Viehbacher confirmed that "we've got approximately 2,000 patients on [Leqembi] at the moment" and that "we have an indication that there are about 3,800 patients as of last week on the registry[.]"

17.     On this news, the Company's stock price fell $18.09 per share, or 7.39%, to close at $226.65 per share on February 13, 2024.

18.     On February 14, 2024, the Company filed an annual report on Form 10-K with the SEC, for the fiscal quarter and year ended December 31, 2023 (the "2023 10-K"), revealing that it had received a subpoena from the U.S. Department of Justice ("DOJ") "seeking information relating to [Biogen's] business operations in several foreign countries" and that "[t]he Company is also providing information relating to [its] business operations in several foreign countries to the SEC."

19.     On this news, Biogen's stock price dropped $5.91 per share, or 2.61% to close at $220.74 per share on February 14, 2024.

20.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public regarding Biogen's business, operations, and prospects. Specifically, throughout the Relevant Period, the Individual Defendants omitted material facts by failing to disclose, among other things, that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct

6

incentivized heightened governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP diluted EPS; and (f) the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

21.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

22.     As a result of the foregoing, a securities fraud class action was filed against the Company, CEO Viehbacher, Chief Financial Officer ("CFO") Michael R. McDonnell ("McDonnell"), and former CEO Michel Vounatsos ("Vounatsos") captioned *Gray v. Biogen Inc. et al*, Docket No. 1:24-cv-01444 (D. Colo. May 22, 2024) (the "Securities Class Action"). The Securities Class Action has exposed the Company to massive class-wide liability.

23.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

24.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual

Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Biogen's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act over the claims asserted herein for violations of Sections 14(a) and 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Biogen is headquartered in the District, a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an

effect in this District.

## PARTIES

*Plaintiff*

30.     Plaintiff is and has been a continuous shareholder of Biogen common stock since at least January 2022.

*Nominal Defendant*

31.     Nominal Defendant Biogen is incorporated under the laws of Delaware, with its principal executive offices located at 225 Blinney Street, Cambridge, Massachusetts 02142. Biogen's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BIIB."

*Individual Defendants*

32.     Defendant McDonnell has served as the Company's Executive Vice President and CFO since August 2020. As set forth in the proxy statement filed by Biogen with the SEC on April 26, 2024 (the "2024 Proxy"), Defendant McDonnell received $7,167,601 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, McDonnell beneficially owned 19,406 shares of Biogen stock as of April 22, 2024. Defendant McDonnell is also named as a defendant in the Securities Class Action.

33.     Defendant Viehbacher has served as the Company's President and CEO, and as a member of the Board, since November 2022. As set forth in the 2024 Proxy, Defendant Viehbacher received $4,069,913 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Viehbacher beneficially owned 33,840 shares of Biogen stock as of April 22, 2024. Defendant Viehbacher is also named as a defendant in the Securities Class Action.

34.     Defendant Vounatsos served as the Company's CEO and as a member of the Board

from January 2017 to November 2022. As set forth in the proxy statement filed by Biogen with the SEC on April 28, 2024 (the "2023 Proxy"), Defendant Vounatsos received $26,625,221 in compensation from the Company in fiscal year 2022. According to the 2023 Proxy, Vounatsos beneficially owned 67,262 shares of Biogen stock as of April 28, 2023. Defendant Vounatsos is also named as a defendant in the Securities Class Action.

35.     Defendant Alexander J. Denner ("Denner") served as a member of the Board from 2009 to June 2023. Defendant Denner previously served as the Chair of the Corporate Governance Committee. As set forth in the 2023 Proxy, Defendant Denner received $425,246 in compensation from the Company in fiscal year 2022. According to the 2023 Proxy, Denner beneficially owned 658,099 shares of Biogen stock as of April 28, 2023.

36.     Defendant Caroline D. Dorsa ("Dorsa") has served as a member of the Board since January 2010. Defendant Dorsa also serves as the Chair of the Board's Corporate Governance Committee and previously served as the Chair of the Audit Committee. As set forth in the 2024 Proxy, Defendant Dorsa received $646,132 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Dorsa beneficially owned 24,822 shares of Biogen stock as of April 22, 2024.

37.     Defendant Maria C. Freire ("Freire") has served as a member of the Board since June 2021. Defendant Freire also serves as a member of the Board's Compensation and Management Development Committee. As set forth in the 2024 Proxy, Defendant Freire received $412,899 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Freire beneficially owned 3,105 shares of Biogen stock as of April 22, 2024.

38.     Defendant William A. Hawkins ("Hawkins") has served as a member of the Board since June 2019. Defendant Hawkins also currently serves as Chair of the Board's Audit

Committee and as a member of the Board's Corporate Governance Committee. As set forth in the 2024 Proxy, Defendant Hawkins received $425,729 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Hawkins beneficially owned 5,150 shares of Biogen stock as of April 22, 2024.

39.     Defendant William D. Jones ("Jones") served as a member of the Board from June 2021 to June 2023. As set forth in the 2024 Proxy, Defendant Jones received $425,729 in compensation from the Company in fiscal year 2023. As set forth in the 2023 Proxy, Defendant Jones received $437,746 in compensation from the Company in fiscal year 2022. According to the 2023 Proxy, Jones beneficially owned 2,145 shares of Biogen stock as of April 28, 2023.

40.     Defendant Jesus B. Mantas ("Mantas") has served as a member of the Board since June 2019. Defendant Mantas also serves as Chair of the Board's Compensation and Management Development Committee and as a member of the Board's Audit Committee. As set forth in the 2024 Proxy, Defendant Mantas received $433,229 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Mantas beneficially owned 6,048 shares of Biogen stock as of April 22, 2024.

41.     Defendant Richard C. Mulligan ("Mulligan") served as a member of the Board from June 2009 to June 2023. As set forth in the 2024 Proxy, Defendant Mulligan received $70,000 in compensation from the Company in fiscal year 2023. As set forth in the 2023 Proxy, Defendant Mulligan received $410,246 in compensation from the Company in fiscal year 2022. According to the 2023 Proxy, Mantas beneficially owned 15,099 shares of Biogen stock as of April 28, 2023.

42.     Defendant Stelios Papadopoulos ("Papadopolos") served as a member of the Board from July 2008 to June 2023. As set forth in the 2024 Proxy, Defendant Papadopolos received $140,000 in compensation from the Company in fiscal year 2023. As set forth in the 2023 Proxy,

Defendant Papadopolos received $667,321 in compensation from the Company in fiscal year 2022. According to the 2023 Proxy, Papadopolos beneficially owned 38,301 shares of Biogen stock as of April 28, 2023.

43.     Defendant Eric K. Rowinsky ("Rowinsky") has served as a member of the Board since March 2010. Defendant Rowinsky also serves as a member of the Board's Compensation and Management Development Committee and Corporate Governance Committee. As set forth in the 2024 Proxy, Defendant Rowinsky received $418,023 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Rowinsky beneficially owned 20,629 shares of Biogen stock as of April 22, 2024.

44.     Defendant Stephen A. Sherwin ("Sherwin") has served as a member of the Board since March 2010. Defendant Sherwin also serves as a member of the Board's Audit Committee. As set forth in the 2024 Proxy, Defendant Sherwin received $435,317 in compensation from the Company in fiscal year 2023. According to the 2024 Proxy, Sherwin beneficially owned 18,738 shares of Biogen stock as of April 22, 2024.

45.     Defendants referenced in paragraphs 32 through 44 are herein referred to as the "Individual Defendants."

46.     The Individual Defendants, together with Biogen, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.     By reason of their positions as officers and/or directors of Biogen, and because of their ability to control the business and corporate affairs of Biogen, the Individual Defendants owed Biogen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Biogen in a fair, just,

honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Biogen and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Biogen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Biogen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Biogen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

52.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE,

the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

53.    To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Biogen were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Biogen's own Code of Business Conduct (the "Code of Conduct") and Corporate Governance Guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Biogen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Biogen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Biogen's operations would comply with all applicable laws and Biogen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

54.     Each of the Individual Defendants further owed to Biogen and the shareholders the duty of loyalty requiring that each favor Biogen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

55.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Biogen and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, and directorial positions with

Biogen, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Biogen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

61.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Biogen, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Biogen and at all times acted within the course and scope of such agency.

## BIOGEN'S CODE OF CONDUCT

64.     Biogen's Code of Conduct, which applies to all of the Company's directors, officers and other employees, describes "how we put our cultural Elements into action with a focus on ethics."

65.     In a section titled "We are fair and honest," the Code of Conduct states, in relevant part:

> We operate fairly and honestly with all of our stakeholders and business partners and expect that they will do the same. Our books, records and financial statements must be honest, accurate, objective, complete and timely in order to ensure we make sound business decisions.
>
> We Communicate Transparently
>
> We are transparent and communicate truthful information in a manner that is not misleading. Our promotional, medical and investor information is appropriately vetted and approved prior to use.
>
> Maintaining Strong Business Partnerships
>
> We treat all our business partners fairly and honestly, and we expect them to act with integrity. In dealing with Biogen, suppliers and business partners must follow the Code.

66.     In a section titled "Complete, accurate and timely disclosures and business

records," the Code of Conduct states, in relevant part:

> Our Company is subject to extensive and complex reporting requirements. Our operations must comply with all applicable regulatory, accounting, financial, tax and other rules and regulations of the jurisdictions in which we operate.

> Business partners, government officials, investors and the public rely on the accuracy and completeness of our financial reports, business records and what we tell them. All of our financial records and accounts, and financial statements must be clear and complete, maintained in reasonable detail, and appropriately reflect our Company's transactions and activities. This includes our financial records and operational data such as cost and production data, expense reports and employee records. Accurate and complete information is also essential to us as a basis for sound decision-making.

> The Company's filings with the Securities and Exchange Commission, as well as other public disclosures by or on behalf of our Company, must be fair, complete, accurate, timely, and understandable. Our accounting and financial reporting practices must also comply with applicable generally accepted accounting principles and other criteria, such as local statutory reporting and tax requirements. Depending on their positions with the Company, employees may be called upon to provide necessary information to assure that the Company's filings and public communications meet these standards. The Company expects employees to take this responsibility seriously and to promptly provide current, accurate and complete answers to inquiries related to the Company's public disclosure requirements.

67.     In a section titled "Managing Our Records," the Code of Conduct states, in relevant part:

> Each of us is responsible for information and records under our control so we need to be familiar with the records management procedures that apply to our jobs.

> Biogen has a records and information management policy and procedures to ensure that our financial records and information are appropriately maintained, stored, secured and destroyed in accordance with our business needs and in compliance with applicable laws and regulations.

> We maintain paper and electronic records for as long as required by our policies and law and our records are organized so that they can be located and retrieved when needed. Documents should only be destroyed in accordance with our Global Records Retention and Disposition Policy, and never in response to or in anticipation of litigation, an investigation or an audit.

68.     With respect to "Insider Trading," the Code of Conduct provides:

We will not use Biogen information or information from our business partners for personal benefit.

Our Global Insider Trading and Information Policy prohibits all of our directors, officers, employees, and temporary staff worldwide, as well as their immediate family members, from trading securities, or disclosing or passing along information to others who then trade (i.e. "tipping"), on the basis of material non-public information. You may only purchase or sell a company's securities if you are not in possession of material non-public information about the company. Additionally, certain individuals are subject to additional trading restrictions, which limit those individuals to trading in the Company's securities only during certain open trading windows or under a 10b5-1 trading plan.

Material information is information that a reasonable investor would consider important in deciding whether to buy or hold a security. Examples that may be considered material:

> A pending or proposed acquisition, sale or other significant transaction

> Results of late-stage clinical trials

> A significant product development or important information about a product, such as serious product safety issues

> Receipt of regulatory approval or failure to obtain regulatory approval for products

> Significant litigation or patent-related events

> Earnings or financial performance

Information is considered non-public if it has not been previously disclosed to the public through press releases or SEC filings and is otherwise not available to the general public. Information is generally considered "public" after it has been publicly available for at least 24 hours after disclosure.

Violations of the insider trading laws are severe and include civil and criminal fines and penalties. It is your responsibility to ensure that you do not violate the insider trading laws or our Global Insider Trading and Information Policy.

69.    With respect to "Compliance with laws, regulations, and standards," the Code of

Conduct provides:

We live and work in a global environment and fact a number of laws and regulations governing our industry's operations. These laws and regulations have a direct impact on our daily work. They also govern our interactions with our many business partners and associates such as researchers, patients, healthcare professionals and governments.

We understand that these laws and regulations are there to help protect our employees and the patients, customers, and investors we serve. For that simple reason, we are committed to upholding the letter and spirit of these laws and regulations wherever we do business, succinctly summarized as follows:

- Everywhere we operate; we must be aware of and comply with laws and regulations that govern our business activities

- Since we operate in many different countries and jurisdictions, there may seem to be a conflict between applicable laws. When you encounter such a conflict, consult with the Legal Department.

70.     In a section titled, "We are transparent and ethical," the Code of Conduct states:

We do not offer or provide improper incentives, kickbacks, or bribes to win business, to influence a business or prescribing decision, or to advance our interests with government authorities. In particular, our interactions with healthcare professionals, government entities, government employees, and others must be legitimate and never to obtain and improper advantage or to improperly influence or encourage a decision by them.

Cooperating with Regulators

We will always comply with relevant laws and regulations and cooperate with government agencies, law enforcement officials and investigators. If you receive any inquiries from government regulators or officials, you should contact the Legal department immediately and wait for their guidance before responding to any such request. When notified of an external investigation, we will take prompt action to preserve documents that may be relevant and respond to requests for information in an honest and timely manner.

We will promptly review all reports of misconduct and undertake investigations to gather additional information. All employees are expected to cooperate fully and truthfully with investigators. Never mislead an investigator and never alter or destroy any records in response to an investigation. Other important points you should know about the investigations process include:

- The facts of the case will typically be developed through interviews and document review.

- Depending on the nature of the investigation and the matters at issue, you may be instructed by the investigators or the Legal department not to discuss any aspect of the investigation.

- If misconduct is discovered, the Company will take whatever corrective or disciplinary action is necessary to address the situation and prevent a recurrence.

**BIOGEN'S AUDIT COMMITTEE CHARTER**

71.     Biogen's Audit Committee Charter states that the purpose of the Audit Committee

is to assist the Board in its oversight of:

- the integrity of the Company's financial statements;

- the accounting and financial reporting processes of the Company;

- the independence, qualifications and performance of the Company's independent registered public accounting firm;

- the effectiveness of the Company's internal control over financial reporting;

- the Company's tax strategy and internal audit and corporate compliance functions;

- the Company's financial strategy, policies and practices;

- management's exercise of its responsibility to assess and manage risks associated with the Company's financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor matters; and

- the adequacy and effectiveness of the Company's insurance programs.

72.     The Audit Committee Charter states that the Audit Committee's authority and

responsibilities pertaining to "Financial Statements and Disclosures," shall be as follows:

- Discuss with management and the independent registered public accounting firm the annual audited financial statements and quarterly financial statements prior to filing, including related disclosures and matters required to be reviewed by the Committee under applicable legal, regulatory or Nasdaq requirements, and such other reports required to be provided by the independent registered public accounting firm under applicable accounting and auditing standards.

- Discuss with management and the independent registered public accounting firm, as appropriate, earnings results, and significant financial disclosure issues, including any related GAAP and nonGAAP annual and quarterly financial information that is included in earnings press releases, including pro forma or adjusted non-GAAP information, and other related financial information or earnings guidance contained therein and/or that is regularly provided to analysts and ratings agencies.

- At least on an annual basis, review with management and the independent registered public accounting firm the Company's financial reporting and accounting policies and principles significant changes in such policies or principles or in their application the key accounting decisions affecting

the Company's financial statements, including alternatives to, and the rationale for, the decisions made.

- Review with management and the independent registered public accounting firm the effect of regulatory and accounting trends, developments and initiatives on the Company's financial statements.

- Review and investigate, as appropriate, matters pertaining to the integrity of the Company's financial statements.

- Establish procedures for confidential and anonymous submission and treatment of complaints regarding the Company's accounting, internal controls, disclosure or other financial or auditing matters.

- Prepare and publish an annual Committee report in the Company's proxy statement in accordance with applicable SEC rules and regulations.

73.    With respect to "Internal Controls," the Audit Committee Charter provides that the

Audit Committee shall:

- At least on an annual basis, review with management and the independent registered public accounting firm the adequacy and effectiveness of the Company's system of internal financial and accounting controls and the Company's disclosure controls, procedures and procedures, including their effectiveness.

- Review with management the Company's assessment of its significant financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor risk exposures and steps taken by management to monitor and mitigate such exposures.

74.    In a section concerning responsibilities related to "Corporate Compliance," the

Audit Committee Charter provides:

- Oversee the Company's ABAC, patient, healthcare provider and third party payor compliance program ("Corporate Compliance Program") and Chief Compliance Officer ("CCO").

- Approve the hiring, evaluation, compensation, and dismissal of the Chief Compliance Officer.

- Make appropriate inquiries of management and the CCO as to the budget of Corporate Compliance Program and approve the annual Corporate Compliance Program goals.

- Receive regular updates from the CCO regarding the effectiveness of the Corporate Compliance program, progress against goals and monitoring results.

75.     With respect to "Financial Strategy, Policies and Practices and Risk Oversight," the Audit Committee Charter states that the Audit Committee shall:

- Review and recommend for Board approval the Company's long-term capital structure targets, including appropriate levels of debt financing.

- Review and recommend for Board approval borrowing authority consistent with the approved long-term capital structure.

- Review and approve material financing arrangements and guarantees of indebtedness not covered by the approved borrowing authority.

- Advise the Board on equity issuances, share repurchases and dividends.

- Advise the Board on the Company's annual capital budget.

- Approve the Company's marketable securities investment policy and review the Company's management of its marketable securities portfolio and derivative transactions.

- Approve on an annual basis the Company's reliance on any applicable exemptions from requirements that would otherwise apply to the Company's or its subsidiaries' derivatives trading.

- Review management's exercise of its responsibility to assess and manage financial, capital and credit risks.

- Review management's exercise of its responsibility to assess and manage material risks related to IT, cyber security, artificial intelligence and data privacy matters and supply chain matters (e.g., vendor, contract manufacture, inventory and stolen goods). Discuss with management at least semi-annually and more frequently as appropriate the performance and adequacy of the Company's cybersecurity program, the steps that management has taken to monitor, control and limit any cybersecurity risks and the appropriate coverage of such cybersecurity program, incidents, threats and responses by the Company.

## SUBSTANTIVE ALLEGATIONS

### *Background*

76.     While MS-related products have historically been the main driver of the Company's product revenues, the introduction of various new generics into the MS-related market has significantly increased competition, causing a substantial decline in Biogen's MS-related product sales and revenues. As a result, Biogen has increasingly focused on developing new products,

including its AD-related drugs and therapies, to bolster its revenues.

77.     On June 7, 2021, the FDA granted accelerated approval to Biogen's AD-related drug aducanumab, known by its market name Aduhelm. The approval decision, however, was immediately met with criticism. On June 10, 2021, in an article titled "Three F.D.A. Advisers Resign Over Agency's Approval of Alzheimer's Drug," the *New York Times* reported that three scientists had resigned from the independent committee that advised the FDA on the treatment. One of the advisors who resigned, Dr. Aaron Kesselheim, is quoted in the article as stating: "This might be the worst approval decision that the F.D.A. has made that I can remember," noting that the decision was wrong "because of so many different factors, starting from the fact that there's no good evidence that the drug works." The *New York Times* later reported that allegations about collaboration between the FDA and Biogen prompted the FDA "to conduct an internal inquiry after a consumer advocacy group called for an inspector general's investigation[.]" The internal investigation had not been previously disclosed by the FDA.

78.     Biogen and the FDA's communications and conduct have since been the subject of investigations by the FTC, SEC, multiple Congressional Committees, and the Office of the Inspector General of U.S. Department of Health and Human Services.

79.     Several details have since been released, including in December 2022 when the 2022 Congressional Oversight Report found that, among other things, the FDA's interactions with Biogen were atypical and failed to follow the agency's own documentation protocol, the FDA and Biogen inappropriately collaborated on a joint briefing document for a key advisory committee, the FDA approved and Biogen accepted a broad label indication for Aduhelm, despite lack of clinical data on all Alzheimer's disease stages, and Biogen initially set an unjustifiably high price for Aduhelm, at $56,000 per year, despite the impact of the high price on patients and the Medicare

program.

80.     Additionally, in 2022, the DOJ announced that Biogen had agreed to pay $900 million to settle allegations that it had caused the submission of false claims to Medicare and Medicaid by paying kickbacks to physicians to induce them to prescribe the Company's MS-related drugs. Following these allegations and controversies, in November 2022, the Company replaced its CEO and has since released compliance, corporate responsibility, and environmental, social, and governance ("ESG") reports touting the Company's purportedly enhanced.

81.     Despite this, skepticism regarding Aduhelm's regulatory approval continued to contribute to the drug's stunted success in the lucrative AD-treatment market. Accordingly, the launch of Biogen's Leqembi product is essential to mitigating the negative effects of the controversies on the Company's financial performance.

***Materially False and Misleading Statements***

82.     On February 3, 2022, Biogen issued a press release announcing the Company's fourth quarter and full year 2021 results. The press release quoted Defendant Vounatsos as stating that "Biogen continued to execute well in the fourth quarter despite the challenges we have faced," and that "[w]e have introduced the first FDA approved treatment for [AD] in nearly 20 years, and we are engaging with the Centers for Medicare and Medicaid Services with the hope of finding a path for immediate patient access."

83.     With respect to Aduhelm, the press release stated, in relevant part:

In [Q4] 2021 Biogen and Eisai presented data at the annual CTAD conference from approximately 7,000 plasma samples from more than 1,800 patients in the ADUHELM Phase 3 clinical trials showed a statistically significant correlation between plasma p-tau reduction and less cognitive and functional decline in [AD]. Reductions in plasma p-tau181 were also correlated with a lowering of amyloid beta plaque. The analysis of plasma samples was conducted by an independent lab, drawing from the two pivotal ADUHELM Phase 3 EMERGE and ENGAGE trials.

84.     Also on February 3, 2022, the Company filed its annual report for the quarter and year ended December 31, 2021, on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants McDonnell, Vounatsos, Denner, Dorsa, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin. The 2021 10-K also included certifications from Defendants McDonnell and Vounastos pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to its accuracy.

85.     The 2021 10-K purported to warn of risks that "may," "might," or "could" occur "if" Biogen or its employees engaged in wrongful conduct in foreign countries, while downplaying these risks by simultaneously assuring investors that the Company maintained effective compliance controls, policies, and procedures to mitigate these risks. Specifically, the 2021 10-K provided, in relevant part:

> Our activities, and the activities of our collaborators, distributors and other third-party providers, are subject to extensive government regulation and oversight in the U.S. and in foreign jurisdictions, and are subject to change and evolving interpretations, which **could** require us to incur substantial costs associated with compliance or to alter one or more of our business practices . . . . **If** we, or our vendors or donation recipients, are found to fail to comply with relevant laws, regulations or government guidance . . . **we could** be subject to significant fines or penalties. Risks relating to compliance with laws and regulations may be heightened as we continue to expand our global operations and enter new therapeutic areas with different patient populations, which **may** have different product distribution methods, marketing programs or patient assistance programs from those we currently utilize or support.
>
> *                    *                    *
>
> Violations of governmental regulation may be punishable by criminal and civil sanctions, including fines and civil monetary penalties and exclusion from participation in government programs . . . as well as against executives overseeing our business . . . . In addition, legal proceedings and investigations are inherently unpredictable, and large judgments or settlements sometimes occur. While we believe that **we have appropriate compliance controls, policies and procedures in place to comply with the laws or regulations of the jurisdictions in which we operate**, there is a risk that acts committed by our employees, agents, distributors, collaborators or third-party providers **might** violate such laws or regulations.

> Whether or not we have complied with the law, an investigation or litigation related to alleged unlawful conduct could increase our expense, damage our reputation, divert management time and attention and adversely affect our business.[1]

86.    Additionally, the 2021 10-K purported to warn of "possible" risks that "may" or "could" occur "if" Biogen or its employees ran afoul of laws prohibiting foreign corrupt practices, while again downplaying these risks by simultaneously assuring investors that the Company maintained effective compliance controls, policies, and procedures to mitigate these risks. Specifically, the 2021 10-K stated, in relevant part:

> [O]ur international operations are subject to regulation under U.S. law. For example, the U.S. Foreign Corrupt Practices Act (FCPA) prohibits U.S. companies and their representatives from paying, offering to pay, promising to pay or authorizing the payment of anything of value to any foreign government official, government staff member, political party or political candidate for the purpose of obtaining or retaining business or to otherwise obtain favorable treatment or influence a person working in an official capacity. In many countries, the health care professionals we regularly interact with ***may*** meet the FCPA's definition of a foreign government official. Failure to comply with domestic or foreign laws ***could*** result in various adverse consequences, including possible delay in approval or refusal to approve a product, recalls, seizures or withdrawal of an approved product from the market, disruption in the supply or availability of our products or suspension of export or import privileges, the imposition of civil or criminal sanctions, the prosecution of executives overseeing our international operations and damage to our reputation . . . . [W]hile ***we believe that we have appropriate compliance controls, policies and procedures in place to comply with the FCPA***, there is a risk that acts committed by our employees, agents, distributors, collaborators or third-party providers might violate the FCPA and we might be held responsible. If our employees, agents, distributors, collaborators or third-party providers are found to have engaged in such practices, we could suffer severe penalties and may be subject to other liabilities, which could negatively affect our business, operating results and financial condition.

87.    The above statements in the 2021 10-K, purportedly warning of risks, failed to acknowledge actual known risks the Company faced due to Individual Defendants' failure to maintain efficient compliance controls, policies and procedures related to employees' illegal,

---

[1] Emphases added unless otherwise indicated.

illicit, or otherwise improper conduct in foreign countries. Rather, the risk warnings were boilerplate, catch-all provisions, not tailored to Biogen's actual known risks.

88.     On April 29, 2022, the Company filed a proxy statement with the SEC (the "2022 Proxy"). Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin and Vounatsos solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

89.     The 2022 Proxy solicited shareholders to vote to, among other things: (a) elect Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin and Vounatsos to the Board; (b) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022; and (c) hold an advisory vote on executive compensation.

90.     In a section detailing the Code of Conduct, the 2022 Proxy stated, in relevant part:

Biogen is committed to leadership actions across all aspects of ESG. Our Board of Directors has oversight of ESG matters and as an element of our commitment to corporate responsibility throughout the company, employees are required to complete annual training in ethics, as part of training on the Biogen Code of Business Conduct.

For more information on our commitment to addressing environmental, social and governance aspects across our business, please see our report, Year in Review: Our Commitment to Corporate Responsibility, which is posted on our website, www.biogen.com, under the "Corporate Responsibility" section of the website. We believe these efforts reflect the best interests of our employees, our patients, our stockholders and various other stakeholders, including the communities in which we operate and serve.

Furthermore, we are committed to transparent and clear disclosure of our policies and performance on a broad array of issues. Our Year in Review meets the Global Reporting Initiative framework and aligns with the Sustainability Accounting Standards Board, the Task Force on Climate-Related Financial Disclosures, the United Nations Global Compact Sustainable Development Goals and the World Economic Forum Stakeholder Capitalism Metrics.

91.     With respect to the Board's role in risk oversight, the 2022 Proxy provided:

Our Board of Directors oversees the management of material risks facing the Company. Biogen is committed to fostering a company culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation. Our Board of Directors and its committees oversee our efforts to foster this culture. Our Board of Directors regularly receives information about our material strategic, operational, financial and compliance risks and management's response to, and mitigation of, such risks. In addition, our risk management systems, including our risk assessment processes, internal control over financial reporting, compliance programs and internal and external auditing procedures, are designed to inform management and our Board of Directors about our material risks. As part of its risk oversight function, our Board of Directors and its committees review this framework, its operation and our strategies for generating long-term value for our stockholders to ensure that such strategies will not motivate management to take excessive risks.

Our Board of Directors also reviews enterprise risks and discusses them with our management, including issues relevant to our business, reputation and strategy, including intellectual property risk, pipeline and business development, pricing and patient access, legal and regulatory matters and manufacturing. In addition, our Board of Directors and its committees oversee elements of our culture. Management updates our C&MD Committee on our compensation practices and progress against strategies and objectives in the areas of management and leadership development and diversity as well as steps taken to address matters such as inappropriate workplace behavior, including harassment and retaliation. In addition, our Audit Committee is responsible for the oversight of our compliance program.

In determining the allocation of risk oversight responsibilities, our Board of Directors and its committees generally oversee material risks within their identified areas of concern. Our Board of Directors and each of its committees meet regularly with management to ensure that management is exercising its responsibility to identify relevant risks and is adequately assessing, monitoring and taking appropriate action to mitigate risk. In the event a committee receives a report from members of management on areas of material risk to the Company, the Chair of the relevant committee reports on the discussion to the full Board of Directors at the next Board of Directors meeting. This enables our Board of Directors and its committees to coordinate their oversight of risk and identify risk interrelationships.

92.     In a section detailing the Audit Committee's oversight responsibility, the 2022 Proxy stated:

The Audit Committee's role is to act on behalf of our Board of Directors in the oversight of Biogen's financial reporting, internal control and audit functions. The roles and responsibilities of the Audit Committee are set forth in the written charter adopted by our Board of Directors, which is posted on our website,

www.biogen.com, under the "Corporate Governance" subsection of the "Investors" section of the website. Management has primary responsibility for the financial statements and the reporting process, including the systems of internal control.

93.     The statements detailed above in the 2022 Proxy were materially false and misleading, and failed to disclose that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; and (e) the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

94.     On January 6, 2023, Biogen and Eisai issued a joint press release announcing that the FDA had approved Leqembi as a treatment for AD under the FDA's Accelerated Approval Pathway. With respect to ensuring patient access to Leqembi, the press release stated, in relevant part:

> The Eisai Patient Support Program offers several support programs to help patients and care partners. Dedicated Patient Navigators will work directly with patients and families to navigate treatment and coverage for eligible and appropriate patients and to help with what to expect regarding insurance coverage, co-pay and patient access programs.
>
> *          *          *
>
> In addition, to support access to LEQEMBI for certain financially disadvantaged patients, Eisai's Patient Assistance Program (PAP) will provide LEQEMBI at no cost, for eligible uninsured and underinsured patients, including Medicare beneficiaries, who meet financial need and other program criteria. Eisai looks

forward to continuing to engage constructively with various payors, including the Centers for Medicare and Medicaid (CMS), TRICARE, the U.S. Veteran's Health Administration and private health insurance companies to ensure appropriate beneficiaries have access to this new therapy . . . . Medicaid sole beneficiaries who are diagnosed by a healthcare professional with mild cognitive impairment or mild dementia stage of disease, and with confirmed presence of amyloid plaque in the brain will have access to LEQEMBI under the Medicaid program post accelerated approval, depending on individual state processes.

95.     On February 15, 2023, the Company issued a press release announcing its fourth quarter and fully year 2022 results. The press release provided FY 2023 non-GAAP diluted EPS guidance in a range of $15.00 to $16.00 per share, and purported to warn that:

This financial guidance does not include any impact from potential acquisitions or large business development transactions or pending and future litigation, as all are hard to predict, or any impact of potential tax or healthcare reform. Biogen may incur charges, realize gains or losses, or experience other events or circumstances in 2023 that could cause any of these assumptions to change and/or actual results to vary from this financial guidance.

96.     The purported risk warning contained in the February 15, 2023 press release was a boilerplate, catch-all provision that was not tailored to Biogen's actual known risks regarding its likely acquisition of Reata and/or other companies to offset its declining MS-related product sales, nor the related adverse effects of such acquisitions on the Company's EPS.

97.     Also on February 15, 2023, the Company filed its annual report for the quarter and year ended December 31, 2022 on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants McDonnell, Vounatsos, Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, and Sherwin and contained SOX certifications signed by Defendants McDonnell and Viehbacher attesting to its accuracy.

98.     The 2022 10-K contained the same boilerplate, catch-all risk warnings included in the 2021 10-K including any potential issues that "may", "might", or "could" occur "if" the Company or its employees participated in improper or wrongful conduct abroad, as well as

"possible" risks that "may" or "could" occur "if" Biogen or its employees violated any laws barring foreign corrupt practices. Accordingly, the 2022 10-K continued minimize the potential risks by affirming that Biogen's compliance management, including its compliance controls, policies, and procedures, could effectively reduce these risks.

99.     On April 25, 2023, Biogen issued a press release announcing its first quarter 2023 results. That press release reaffirmed the Company's full year 2023 non-GAAP diluted EPS guidance in a range of $15.00 to $16.00 per share, and contained the same boilerplate, catch-all risk warnings as the February 15, 2023 press release detailed above. Similarly, these risk warnings were not tailored to Biogen's actual known risks regarding its likely acquisition of Reata and/or other companies to offset its declining MS-related product sales, nor the likely discontinuation of Aduhelm's development and commercialization or the related adverse effects of such acquisitions on the Company's EPS.

100.     On April 28, 2023, the Company filed the 2023 Proxy with the SEC. Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, and Sherwin solicited the 2023 Proxy filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

101.     The 2023 Proxy called for shareholders to vote to, among other things: (1) elect Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, Sherwin and Viehbacher, to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) hold an advisory vote on executive compensation; and (4) hold an advisory vote on the frequency of future advisory votes on executive compensation.

102.     In a section detailing the Code of Conduct, the 2023 Proxy provided, in relevant

part:

Biogen is committed to leadership actions across all aspects of ESG. Our Board of Directors has oversight of ESG matters and as an element of our commitment to corporate responsibility throughout the company, employees are required to complete annual training in ethics, as part of training on the Biogen Code of Business Conduct.

For more information on our commitment to addressing environmental, social and governance aspects across our business, please see our report, Year in Review: Our Commitment to Corporate Responsibility, which is posted on our website, www.biogen.com, under the "Corporate Responsibility" section of the website. We believe these efforts reflect the best interests of our employees, our patients, our stockholders and various other stakeholders, including the communities in which we operate and serve.

Furthermore, we are committed to transparent and clear disclosure of our policies and performance on a broad array of issues. Our Year in Review meets the Global Reporting Initiative framework and aligns with the Sustainability Accounting Standards Board, the Task Force on Climate-Related Financial Disclosures, the United Nations Global Compact Sustainable Development Goals and the World Economic Forum Stakeholder Capitalism Metrics.

103.    With respect to the Board's role in risk oversight, the 2023 Proxy provides:

Our Board of Directors oversees the management of material risks facing the Company. Biogen is committed to fostering a company culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation. Our Board of Directors and its committees oversee our efforts to foster this culture. Our Board of Directors regularly receives information about our material strategic, operational, financial and compliance risks and management's response to, and mitigation of, such risks. In addition, our risk management systems, including our risk assessment processes, internal control over financial reporting, compliance programs and internal and external auditing procedures, are designed to inform management and our Board of Directors about our material risks. As part of its risk oversight function, our Board of Directors and its committees review this framework, its operation and our strategies for generating long-term value for our stockholders to ensure that such strategies will not motivate management to take excessive risks.

Our Board of Directors also reviews enterprise risks and discusses them with our management, including issues relevant to our business, reputation and strategy, including intellectual property risk, pipeline and business development, pricing and patient access, legal and regulatory matters and manufacturing. In addition, our Board of Directors and its committees oversee elements of our culture. Management updates our C&MD Committee on our compensation practices and

33

progress against strategies and objectives in the areas of management and leadership development and diversity as well as steps taken to address matters such as inappropriate workplace behavior, including harassment and retaliation. In addition, our Audit Committee is responsible for the oversight of our compliance program.

In determining the allocation of risk oversight responsibilities, our Board of Directors and its committees generally oversee material risks within their identified areas of concern. Our Board of Directors and each of its committees meet regularly with management to ensure that management is exercising its responsibility to identify relevant risks and is adequately assessing, monitoring and taking appropriate action to mitigate risk. In the event a committee receives a report from members of management on areas of material risk to the Company, the Chair of the relevant committee reports on the discussion to the full Board of Directors at the next Board of Directors meeting. This enables our Board of Directors and its committees to coordinate their oversight of risk and identify risk interrelationships.

104.    In a section discussing the Audit Committee's oversight responsibilities, the 2023 Proxy stated:

The Audit Committee's role is to act on behalf of our Board of Directors in the oversight of Biogen's financial reporting, internal control and audit functions. The roles and responsibilities of the Audit Committee are set forth in the written charter adopted by our Board of Directors, which is posted on our website, www.biogen.com, under the "Corporate Governance" subsection of the "Investors" section of the website. Management has primary responsibility for the financial statements and the reporting process, including the systems of internal control.

105.    The statements detailed above in the 2023 Proxy were materially false and misleading, and failed to disclose that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP

diluted EPS; and (f) the Company failed to maintain adequate compliance controls and procedures

related to its business operations in foreign countries, as well as overall internal controls. As a

result, the Company's public statements were materially false and misleading at all relevant times.

106.    On May 1, 2023, Biogen issued a press release announcing the publication of its

ESG Report for the 2022 Fiscal Year (the "2022 ESG Report"). The 2022 ESG Report claimed to

"support[] Biogen's business goals by sharing our corporate responsibility story, disclosing key

[ESG] data and providing updated progress against our targets and commitments."

107.    In a letter included in the 2022 ESG Report, Defendant Viehbacher stated, in

relevant part:

> For decades, Biogen has been committed to corporate responsibility and, every day,
> we are working diligently to build upon our long-held foundation of responding
> appropriately to emerging stakeholder expectations and industry trends to deliver
> benefits for patients and communities.
>
> *          *          *
>
> This is a dynamic time in the healthcare sector, with stakeholder expectations for
> our company and our industry rapidly evolving. Against that backdrop, I want to
> underscore my commitment – reflected in this report – to continuing to advance
> Biogen's culture of transparency and disclosure so that our stakeholders, including
> our employees, patients, investors, partners and communities, have access to
> reliable data-driven information about all the dimensions of our business.

108.    The 2022 ESG Report also touted Biogen's engagement with "[i]nvestors, analysts

and ratings agencies . . . our transparent responses to inquiries from organizations like S&P Global,

JUST Capital and others."

109.    The 2022 ESG Report also contained a section titled "Operating responsibly,"

which stated, in relevant part:

> Maintaining high standards for corporate responsibility helps us deliver on our
> purpose and on advancing a healthier, more sustainable and equitable world.

**Advancing an ethical culture**

Every action we take, from pioneering new therapies to promoting health equity, is guided by our unwavering commitment to integrity through:

− **Biogen's credo** – Caring Deeply. Working Fearlessly. Changing Lives.™

− **Biogen Elements** – the foundation of our culture. Just as the periodic table reflects the elements of our universe, the Biogen Elements include pioneering spirit, strong ethics, personal accountability, inclusivity, agility and unwavering customer focus.

− **Code of Business Conduct** – which includes eight Ethical Principles and applies to all Biogen employees, agents and consultants acting on behalf of Biogen and our Affiliates worldwide.

We see these commitments as key enablers of Biogen's business, and in honoring them, we foster an environment of trust, honesty and transparency while ensuring appropriate confidentiality.[2]

110.    With respect to Biogen's purportedly robust global compliance policies and procedures, the 2022 ESG Report stated, in relevant part:

Compliance with our Code of Business Conduct, Ethical Principles and the law is mandatory for all employees and a priority of our leaders, without exception.

At the enterprise level, we monitor and address compliance issues very closely. We have more than 20 full-time compliance officers who are embedded with the businesses globally. They use advanced artificial intelligence and other tools and technology to identify and address potential issues.

We also require every employee to report actual or suspected violations of the law or the Code of Business Conduct either to their manager, to a compliance officer or through an anonymous 24/7 helpline . . . . All claims of misconduct . . . are thoroughly investigated.

111.    On July 6, 2023, Biogen and Eisai issued a joint press release announcing that the FDA had granted the traditional approval of Leqembi as treatment for AD. The press release highlighted the broad coverage of Leqembi and held the drug out to be easily accessible, stating, in relevant part:

Importantly, following FDA's traditional approval of LEQEMBI, CMS confirmed

---

[2] Emphases in original.

that broader coverage of LEQEMBI is now available and released more details on the registry, including the easy-to-use data submission process. The CMS facilitated registry is now available for healthcare professionals to submit required patient data to CMS. Eisai is pleased that Medicare will cover this important therapy for appropriate patients. This will facilitate reimbursement for and access to LEQEMBI across a broad range of healthcare settings in the [U.S.].

*          *          *

Eisai is committed to ensuring that appropriate patients have access to LEQEMBI and has established a Patient Assistance Program to provide LEQEMBI at no cost, for eligible uninsured and underinsured patients, including Medicare beneficiaries, who meet financial need and other program criteria. Additionally, Eisai offers patient support for improving access through LEQEMBI Patient Navigators, who will provide information about accessing LEQEMBI, help patients and their families understand their insurance coverage and options, and identify financial support programs for eligible patients.

112.    The press release also quoted Eisai's U.S. CEO, Ivan Cheung, as stating that "[w]e continue to work to create broad and simple access to LEQEMBI for patients and to support diagnosis and treatment at the early stage of the disease."

113.    The press release also quoted Defendant Viehbacher, who assured investors that "[o]ur focus is now on the path forward, working alongside Eisai with the goal of making LEQEMBI accessible to eligible patients as soon as possible."

114.    On July 25, 2023, Biogen issued a press release announcing its second quarter 2023 results and affirming Biogen's full year 2023 non-GAAP diluted EPS guidance in a range of $15.00 to $16.00 per share. The press release contained boilerplate, catch-all risk warnings not tailored to the Company's actual known risks related to its impending acquisition of Reata and/or other companies to counteract its declining MS-related product sales, nor the potential discontinuation of Aduhelm's development and commercialization or these factors' adverse effects on the Company's EPS.

115.    Biogen announced the proposed acquisition of Reata in a July 28, 2023 press

release. The press release touted that the "[p]roposed acquisition represents meaningful step forward in Biogen's strategy for sustainable growth, adding a highly complementary innovative product in an area of high unmet medical need"; and that the acquisition is "***[e]xpected to be significantly accretive to Biogen's Non-GAAP diluted EPS*** beginning in 2025[.]"

116.  The press release further stated:

> The acquisition of Reata is expected to be ***slightly*** dilutive to Biogen's Non-GAAP diluted [EPS] in 2023, roughly neutral in 2024, and significantly accretive beginning in 2025, inclusive of associated transaction costs. Biogen plans to update its Full Year 2023 Financial Guidance in conjunction with its third quarter 2023 earnings release.

117.  In or around July 2023, the Company publicly posted a document entitled "Comprehensive Compliance Program," (the "2023 Compliance Report") on its website. The 2023 Compliance Report stated, among other things:

> Biogen is committed to . . . maintaining the highest level of integrity and ethical behavior in the conduct of our business. To this end, Biogen's Code of Business Conduct is available to the public through its posting on this website.

> To conduct our business with integrity and ethically, Biogen has established and maintains a compliance program. This program has been developed in accordance with the laws applicable to our industry and the "Program Guidance for Pharmaceutical Manufacturers" published by the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG Guidance"). Moreover, the Pharmaceutical Research and Manufacturers of America, the pharmaceutical industry's trade group, voluntarily adopted its own "Code on Interactions with Healthcare Professionals" known as the "PhRMA Code." Biogen's compliance program requires compliance with the PhRMA Code, which addresses topics such as informational presentations by the Company, third party continuing education and professional meetings, use of consultants and speakers, as well as restrictions on the provision of gifts and financial incentives to healthcare professionals.

118.  The 2023 Compliance Report further added that, consistent with guidance from the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG"), Biogen's compliance program includes, among other things, the "[u]se of audits and other techniques to monitor compliance and identify and address of [sic] risk"; "[e]nforcement of

38

compliance obligations through guidelines that include penalties for noncompliance"; and "[m]echanisms to promptly and properly investigate and respond to reports of noncompliance, including processes to initiate corrective measures and to report offenses to the relevant government authorities where appropriate[.]" These statements included in the 2023 Compliance Report misleadingly assured investors that the Company had an effective compliance program in place to monitor, identify, enforce, and correct instances of non-compliance and report such instances to relevant authorities.

119.    The 2023 Compliance Report ends with a representation that, "as of July 1, 2023, Biogen is in material compliance with its Comprehensive Compliance Program and the requirements of the California Health & Safety Code section 119402."

120.    Biogen announced the completion of the Reata Acquisition in a press release published September 26, 2023. The press release stated, in relevant part:

> Biogen anticipates significant synergies with its existing rare disease portfolio and plans to update its Full Year 2023 Financial Guidance in conjunction with its third quarter 2023 earnings release. The acquisition of Reata is expected to be ***slightly*** dilutive to Biogen's Non-GAAP diluted [EPS] in 2023, roughly neutral in 2024, and significantly accretive beginning in 2025, inclusive of associated transaction costs.

121.    The statements detailed above were false and misleading when made, and omitted material facts about the Company's business, operations, and prospects. Specifically, and throughout the Relevant Period, the Individual Defendants omitted material facts by failing to disclose, among other things, that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened

governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP diluted EPS; and (f) the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

***The Truth Emerges***

122.     On November 8, 2023, the Company issued a press release announcing its third quarter 2023 financial results. In the press release, Biogen updated its non-GAAP diluted EPS guidance for the 2023 Fiscal Year to a range of $14.50 to $16.00 per share, citing approximately $0.75 of dilution from the Reata Acquisition.

123.     On this news, the Company's stock price fell $13.92 per share, or 5.67%, to close at $231.69 per share on November 8, 2023.

124.     The November 8, 2023 press release, however, did not disclose the full truth behind the Company's improper conduct as alleged above. For instance, the November 8, 2023 press release contained boilerplate, all-encompassing provisions that did not address Biogen's actual known risks tied to its probable discontinuation of Aduhelm's development and commercialization.

125.     Also on November 8, 2023, the Company hosted an earnings call with analysts and investors. During the call, Defendant Viehbacher expressed his confidence in having 10,000 patients on Leqembi by the end of March 2024, stating:

> So, of course, we have an aim of getting to 10,000 patients by the end of March. We're at 800 now. What gives us the confidence that we think we can get there? I think we have a number of greenshoots here, signs of progress.

The first is, as we look at our internal metrics of intent to treat and patient demand, we are seeing all of those things progress extremely nicely. The FDA not only provided traditional approval, but CMS actually moved very quickly, the day of traditional approval, as they promised. They actually have provided reimbursement and the patient registry has so far from what we hear from the market been relatively easy to use.

$$*\qquad\qquad*\qquad\qquad*$$

I think one of the most interesting things is we've got 60% of the top 100 targeted IDMs now having P&T [pharmacy and therapeutics] approval. And one of the things that really gives me a lot of inspiration is usually these P&T committees meet twice a year, but a number of them actually have organized special meetings just for LEQEMBI and not wait until the next meeting. And that says to me that there's a recognition of the importance of this treatment and being able to get patients on treatment.

$$*\qquad\qquad*\qquad\qquad*$$

So now, of course, we're also looking at executing on geographic expansion. We've had the recent approval of Japan and I'm traveling to Japan early in the new year to be with my friend and colleague, the CEO of Eisai to launch LEQEMBI in Japan. And of course, we've got global filings under review in the EU, China and 10 other markets.

So this is one where we're going to have to be patient, but all the signs are green at this moment. And for us, internally, we see a launch that is on track.

126.    On December 12, 2023, Biogen and Eisai issued a joint press release announcing the anticipated launch of Leqembi for the treatment of AD in Japan. Eisai's CEO, Haruo Naito, was quoted in the press release as stating:

> The establishment of an optimal and fast Alzheimer's disease diagnosis and treatment pathway for patients is a top priority, and close collaboration among the government, dementia specialists, primary care physicians, radiologists, pharmacists, nurses, clinical psychologists, radiology staff, medical office personnel, and caregivers is essential for this purpose. In consideration of the importance of Alzheimer's disease in Japan, we believe it is imperative that such pathways be established. We are committed to taking this first step towards changing the future of Alzheimer's disease together with our stakeholders.

127.    In the same press release, Defendant Viehbacher is quoted as stating, in relevant part:

> The availability of LEQEMBI opens a new era in the treatment of Alzheimer's disease . . . We will work alongside Eisai to engage the medical community and support the patient journey, especially early diagnosis[.]

128.    The November 8, 2023 and December 12, 2023 statements detailed above were false and misleading when made, and omitted material facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants omitted material facts by failing to disclose, among other things, that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP diluted EPS; and (f) the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

129.    On January 8, 2024, during J.P. Morgan Conference, Defendant Viehbacher stated that the Company was facing challenges with the launch of Leqembi and provided additional commentary on the previous expectations of having 10,000 patients using Leqembi by the end of March 2024. Specifically, Defendant Viehbacher stated:

> Remember, the 10,000 was really designed to try to give people some sort of milestone, because there are no real analogues for this launch. I haven't found a decent analog anywhere. So, what I think we were trying to say is, this isn't going to be 100,000 patients, but it is not going to be 1,000 either. So that is a trajectory. And I think where we are right now, there is nothing that we are going to do that's going to change us on the trajectory. We will get there. We don't get there. I think

everything we are seeing. There is no reason to say that, we can't get there.

But again, the data were kind of choppy in December. So, for me, I am really looking for the January data. But where we are right now is, 10,000 isn't really what we are interested anymore. It's how do we now get to the 100,000? And so that's where we are focused. But you can't get to the 100,000 unless you have really got this go-to-market strategy really nailed down. And I think we are increasingly confident in that model.

130.    On this news, Biogen's stock price fell $10.77 per share, or 4.17%, over three consecutive trading days to close at $247.21 per share on January 11, 2024. Yet still, the Individual Defendants continued to make or permit false and misleading statements concerning the Company's compliance controls and procedures, as well as the strength of its AD-related product portfolio and the efforts and success in launching and providing access to Leqembi.

131.    Also on January 8, 2024, at the J.P. Morgan Conference, Defendant Viehbacher asserted that the launch of Leqembi and patient access to the drug remained relatively on track, stating:

So, numbers of PET scans are going up. When we talk to people who are providing the PET scans, they're seeing lots of activity. People who are providing the blood-based biomarkers and diagnostics are seeing increased activity. We're seeing a significant increase in the numbers of new patient starts on the registry. And in terms of reimbursement, CMS said, "Okay, we're now changing and clarifying the reimbursement for PET scans." But that has to be pulled through by the dozen or so max that are out there. And they typically don't move that quickly, but they have moved faster than anybody has ever seen before.

A lot of the IDMs were on formulary, and they have done out of cycle, P&T committee meetings because they see it as an urgency. We certainly have patients waiting for treatment. So, the real job is just establishing the care, pathways getting the policies in place and the blocking and tackling of being able to process the patients. So, I think we're feeling pretty good. I'm looking forward to seeing how the January sales play out. A lot of positive data in December, but December is kind of a funny month with the holiday schedule, but I think we're certainly seeing an awful lot of tremendous progress on LEQEMBI.

*               *               *

We're not seeing any capacity constraints on PET scans nor on MRIs nor on

infusion centers for the moment. So, I think that will flex.

So largely, it is really around the care pathways and just establishing those. And that increases every day when the number of centers ordering from, when we did Q3 earnings to now was up 37%, for example.

*          *          *

[I]t's starting to broaden out. There's still - we've probably got about a target of 10,000, and we're working our way through that.

132.    The following day, on January 9, 2024, Biogen and Eisai issued a joint press release announcing the approval of Leqembi for the treatment of AD in China, stating, in relevant:

> Eisai estimates that there will be 17 million patients with MCI or mild dementia due to AD in China in 2024, which is expected to increase with the aging of the population. Eisai will distribute the product in China and will conduct information provision activities through specialized Medical Representatives. Moving forward, Eisai will focus on AD awareness via omnichannel systems and collaborate with specialists to improve the diagnostic environment, including blood-based biomarkers. In addition, by utilizing online health platform for the elderly "Yin Fa Tong"**, which is already being accessed by a certain number of users and helping provide treatments, Eisai is providing a one-stop service that promotes early consultation by referring patients to medical specialists and follow-up after treatment. In addition, Eisai will work to improve access environments including the development of insurance programs for AD in collaboration with insurance companies. Through these efforts, Eisai will accelerate the construction of a simple patient journey in China.

133.    The January 8, 2024, and January 9, 2024 statements detailed above were false and misleading when made, and omitted material facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants omitted material facts by failing to disclose, among other things, that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or

44

regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to

bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata

Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP diluted EPS; and (f)

the Company failed to maintain adequate compliance controls and procedures related to its

business operations in foreign countries, as well as overall internal controls. As a result, the

Company's public statements were materially false and misleading at all relevant times.

134.     On January 31, 2024, Biogen issued a press release announcing that it would

discontinue development and commercialization of Aduhelm and that it had recorded $60 million

in associated close-out costs, stating, in relevant part:

> Biogen . . . plans to reprioritize its resources in [AD] . . . . The company will
> discontinue the development and commercialization of ADUHELM®
> (aducanumab-avwa) 100 mg/mL injection for intravenous use and will terminate
> the ENVISION clinical study.
>
> *                 *                 *
>
> In January 2023, Biogen began a strategic review of its research and development
> efforts, including seeking potential partners or external financing for ADUHELM,
> as part of a focus on prioritizing the company's portfolio. During this process,
> Biogen considered the time and investment required for the post-marketing
> confirmatory ENVISION study and the likely advancements in the field by the time
> of potential ADUHELM FDA traditional approval. Despite an extensive process,
> the company did not identify potential strategic partners or external financing.
> Biogen has recorded a one-time charge of approximately $60 million related to
> close out costs for the program in the fourth quarter of 2023.

135.     On February 6, 2024, news reports emerged that Eisai was facing challenges with

the launch of Leqembi and that only 2,000 patients in the U.S. had been administered the drug.

For example, an article published by *Bloomberg* that day, entitled "Eisai's New Alzheimer's Drug

Is Falling Short of US Target," stated, in relevant part:

> Eisai Co. said its breakthrough Alzheimer's drug has been administered to 2,000
> patients in the US, falling behind a target of 10,000 people by the end of March.

The medicine is approved for use in three countries so far — the US, Japan and China. About 100 people have used the drug, named Leqembi, in Japan as of Feb. 5, Eisai said in documents released along with earnings on Tuesday. The company also said it's preparing to start selling the drug in China in the second quarter of the 2024 fiscal year.

136.    Following this news, Biogen's stock price fell $5.01 per share, or 2.04%, to close at $240.54 per share on February 7, 2024.

137.    On February 13, 2024, Biogen issued a press release announcing its fourth quarter 2023 and full year 2023 results. The press release reported fourth quarter 2023 non-GAAP EPS of $2.95, missing consensus estimates by $0.23, and revenue of $2.4 billion, missing consensus estimates by $60 million and representing a 5.5% year-over-year decline. The press release attributed the disappointing results to the Company's discontinuation of Aduhelm, including "approximately $60 million in close out costs related to ADUHELM."

138.    On an earnings call hosted by the Company the same day, Defendant Viehbacher confirmed that "we've got approximately 2,000 patients on [Leqembi] at the moment" and that "we have an indication that there are about 3,800 patients as of last week on the registry." Also during the call, in response to an analyst's question concerning "the bottlenecks on the LEQEMBI launch," Defendant Viehbacher stated, in relevant part:

> The bottlenecks, I still -- if you think about it, if the data from the patient registries are accurate, and again, we don't have direct access to that, but it suggests that we've got almost twice as many people on the registry as we do on treatment.
>
> And so that says that in addition to the bottleneck of getting into the neurologist, that there's -- when you get to the registry, you've got a clear intent to prescribe, because on the registry, at least for CMS, you have to describe how you actually validated the diagnosis. So by then, you've triaged the patient, you've done either the PET scan or the CSF markers, and you're looking for reimbursement.
>
> And what we're hearing a little bit is, is that there is some challenge in just scheduling the first MRI, because when we initiate the infusion, you have to have the first MRI within the first two weeks. So people don't want to initiate the infusion until they've got that MRI scheduled. And the MRI -- there isn't an MRI

capacity constraint per se, but you are looking for a specific date, and then you have to back up the infusion. So there's just, I think, until people get the hang of this, getting all that coordination, I think that seems to be where the -- where one of the bottlenecks is.

139.     On February 14, 2024, the Company filed the 2023 10-K, disclosed, in relevant

part:

> The Company has received a subpoena from the DOJ seeking information relating to our business operations in several foreign countries. The Company is also providing information relating to our business operations in several foreign countries to the SEC.

140.     On this news, Biogen's stock price dropped $5.91 per share, or 2.61% to close at

$220.74 per share on February 14, 2024.

***Harm to the Company***

141.     As a direct and proximate result of the Individual Defendants' misconduct, Biogen

has lost and expended, and will lose and expend, millions of dollars.

142.     Such expenditures include, but are not limited to, legal fees associated with the

Securities Class Action filed against the Company, its CEO, CFO, and former CEO, and amounts

paid to outside lawyers, accountants, and investigators in connection thereto.

143.     Such expenditures also include, but are not limited to, the cost of implementing

measures to remediate the material weaknesses in the Company's internal control over financial

reporting.

144.     Such losses also include, but are not limited to, significant compensation and

benefits paid to the Individual Defendants who breached their fiduciary duties to the Company,

including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the

Individual Defendants who breached their fiduciary duties to the Company.

145.     As a direct and proximate result of the Individual Defendants' conduct, Biogen has

also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

147.    Biogen is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

148.    Plaintiff is an owner of Biogen common stock and has been a continuous shareholder of Company stock at all relevant times.

149.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

150.    A pre-suit demand on the Board of Biogen is futile and, therefore, excused. At the time this action was commenced, the ten-member Board consisted of Individual Defendants Dorsa, Freire, Hawkins, Mantas, Rowinsky, Sherwin, and Viehbacher (the "Director Defendants") as well as non-parties Susan Langer, Lloyd B. Minor, and Monish Patolawala. As set forth below, all seven Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

151.    The acts complained of herein constitute violations of fiduciary duties owed by

48

Biogen's officers and directors, and these acts are incapable of ratification.

152.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

153.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

154.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

155.    Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

156.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

157.    Additionally, the Director Defendants took no action to redress the harm suffered

by the Company resulting from the misconduct alleged herein.

158.    Defendants Hawkins, Mantas, and Sherwin (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

159.    Further, the Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

## COUNT I

### Against The Individual Defendants For Violations of § 14(a)
### of the Exchange Act

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

163.    Defendants Dorsa, Freire, Hawinks, Mantas, Rowinsky, Stephen, and Sherwin caused the 2022 Proxy and the 2023 Proxy, and Defendant Viehbacher caused only the 2023 Proxy, to be false and misleading by failing to disclose, among other things, that: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP diluted EPS; and (f) the Company failed to maintain adequate

compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls.

164.     The 2022 Proxy and 2023 Proxy were false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by six of the Individual Defendants.

165.     The false and misleading elements of the 2022 Proxy led to the re-election of Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Papadopoulos, Rowinsky, Sherwin and Vounatsos, thereby allowing them to continue breaching their fiduciary duties to Biogen.

166.     The false and misleading elements of the 2023 Proxy led to the election of Defendants Denner, Dorsa, Freire, Hawkins, Jones, Mantas, Mulligan, Rowinsky, Sherwin, and Viehbacher thereby allowing them to continue breaching their fiduciary duties to Biogen.

167.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy and 2023 Proxy.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

168.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.     The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

170.     The Individual Defendants willfully ignored the obvious deficiencies in the

Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

171.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172.    Specifically, throughout the Relevant Period, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, such that, among other things: (a) the Company participated in illegal or otherwise improper conduct in a number of foreign countries; (b) the Company overstated its efforts to enhance its transparency, corporate governance, and compliance controls and procedures, as well as the effectiveness of those controls and procedures; (c) such overstated efforts, failure to maintain adequate internal controls, and its illegal or improper conduct incentivized heightened governmental and/or regulatory scrutiny and enforcement action; (d) Biogen's and Eisai's launch of Leqembi failed to bolster the Company's AD-related product portfolio; (e) the Company minimized the Reata Acquisition's negative effects on the Company's 2023 fiscal year non-GAAP diluted EPS; and (f) the Company failed to maintain adequate compliance controls and procedures related to its business operations in foreign countries, as well as overall internal controls. As a result, the

Company's public statements were materially false and misleading at all relevant times.

173.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

174.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

175.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

176.    Plaintiff, on behalf of Biogen, has no adequate remedy at law.

## <u>COUNT III</u>

### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

177.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

conduct complained of herein.

179.    Plaintiff on behalf of Biogen, has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Unjust Enrichment

180.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Biogen.

182.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Biogen that was tied to the performance or artificially inflated valuation of Biogen or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

183.    Plaintiff, as a shareholder and a representative of Biogen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

184.    Plaintiff, on behalf of Biogen, has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    The Individual Defendants breached their fiduciary duties by failing to properly

supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the

issuance of, and/or failing to correct the false and misleading statements identified herein, and by

allowing the Company to engage in an illegal, unethical, and improper course of conduct, which

was continuous, connected, and ongoing at all relevant times.

187.    As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and

(b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending

the Company and its officers against the Securities Class Action.

188.    As a result of the waste of corporate assets, the Individual Defendants are liable to

the Company.

189.    Plaintiff, on behalf Biogen, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Biogen and

that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the

Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing Biogen to take all necessary actions to reform and improve its corporate

governance and internal procedures to protect Biogen and its stockholders from a repeat of the

damaging events described herein, including, but not limited to:

▪ strengthening the Board's supervision of operations and compliance with

applicable state and federal laws and regulations;

▪ strengthening the Company's internal reporting and financial disclosure

controls;

    ▪  developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

    ▪  strengthening the Company's internal operational control functions;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 9, 2024

**MATORIN LAW OFFICE, LLC**

By:  */s/ Mitchell J. Matorin*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
tjm@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085

Mitchell M. Matorin (BBO# 649304)
18 Grove Street, Suite 5
Wellesley, MA 02482
Telephone: (781) 453-0100
mmatorin@matorinlawoffice.com

*Attorneys for Plaintiff*